## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No. 11-23650–CIV-ALTONAGA/SIMONTON

**CANADIAN STEEL, INC.**

      **Plaintiff,**

**vs.**

**HFP CAPITAL MARKETS, LLC and**
**GEOFFREY BYRUCH,**

      **Defendants.**

_____/

### PLAINTIFF CANADIAN STEEL, INC.'S MEMORANDUM OF LAW
### IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

COMES NOW, the Plaintiff, Canadian Steel, Inc. (hereinafter "CSI" or "Plaintiff"), by and through the undersigned counsel, in response to Defendants, HFP Capital Markets (hereinafter "HFP") and Geoffrey Byruch (hereinafter "BYRUCH," and together with HFP, the "Defendants"), Motion to Dismiss the Verified Amended Complaint, hereby files this Memorandum of Law in Opposition and attached Affidavit ("Exhibit A"), and states as follows:

### INTRODUCTION & STATEMENT OF FACTS

1. At all times material to this cause, Plaintiff, CSI, is a Florida corporation registered with the State of Florida, with its principal place of business located at 12540 NW South River Drive Medley, Miami, FL 33178. (Am. Comp. ¶ 7; Exhibit A ¶ 3).

2. At all times material to this cause, HFP is a New York Limited Liability Company with its principal place of business located at 685 Fifth Avenue, 9th Floor, New York, NY 10022. HFP conducts business with persons or entities in the state of Florida, is registered to do business in Florida, and a portion of HFP's overall revenue is from Florida-based clients/business partners. HFP representatives have been present in Florida on several occasions for business purposes with CSI as well as others.  (Am. Comp. ¶ 8, 11-14; Exhibit A ¶ 6-7, 16).

3.      At all times material to this cause, BYRUCH has been employed by HFP and is a New Jersey resident, maintaining his domicile and holding his primary state citizenship within the State of New Jersey. (Am. Comp. ¶ 9; Exhibit A ¶ 8).

4.      On or about August 31, 2010, CSI entered into an Equipment Design Build Engineer and Fabricate Contract with Worldwide Mining Partners, LLC (hereinafter "WMP") for seven (7) advanced thermal processing systems, quoted at the contract price of Forty-Seven Million Dollars ($47,000,000.00 USD). (Am. Comp ¶ 20; Exhibit A ¶ 10).

5.      Subsequently, CSI entered into negotiations with the President of WMP, Jerry Pane, to build an additional three (3) plasma-based metallurgic recovery units for a price of Twenty-One Million Dollars ($21,000,000.00 USD).  (Am. Comp. ¶ 21; Exhibit A ¶ 11).

6.      At all times material to this cause, HFP had knowledge of these contractual and business relations between CSI and WMP (Am. Comp. ¶ 28; Exhibit A ¶ 18-19).

7.      In or about June 2011, BYRUCH obtained the CEO position at HFP.  BYRUCH, in his capacity as CEO of HFP, directly contacted WMP's President and made an attempt to acquire an exclusive business relationship with WMP.  BYRUCH also travelled to North Carolina to visit a plasma-based thermal processing facility to create a relationship with a chief plasma physicist to utilize in performing plasma-based thermal processing. (Am. Comp. ¶ 29-32; Exhibit A ¶ 20-23).

8.      BYRUCH, in his capacity as CEO of HFP, with knowledge and malice, made numerous false and defamatory statements about CSI to WMP and other persons and/or other entities, and various employees of HFP.  (Am. Comp. ¶ 36; Exhibit A ¶ 26).

9.      On or about August 30, 2011, BYRUCH, in his capacity as CEO of HFP, approached Jerry Pane, President of WMP, at a charity event at the Jacob Javits Convention Center in New York, NY, whereby BYRUCH approached Mr. Pane and made various statements concerning CSI.  (Am. Comp. ¶ 36-37; Exhibit A ¶ 27).

10.     BYRUCH, in his capacity as CEO of HFP, with knowledge and malice, made numerous false and defamatory statements to the President of WMP, Jerry Pane, about CSI, including that CSI is only a website and not a "real business," that CSI has no experience in steel fabrication, CSI is a complete "fraud," and that CSI is not qualified to design, fabricate or construct the equipment that WMP sought to purchase.  (Am. Comp. ¶ 38-39, 42; Exhibit A ¶ 28, 30).

11.     BYRUCH, with knowledge and malice, in his capacity as CEO of HFP, stated to the President of WMP, Jerry Pane, that CSI's President, George Mesa, Sr., is a fraud and has no

experience in steel fabrication, and that CSI's President, George Mesa, Sr., is not qualified to fulfill the contract with WMP or any future contacts.  (Am. Comp. ¶ 40-41; Exhibit A ¶ 29).

12.     BYRUCH, in his capacity as CEO of HFP, made the aforementioned false and defamatory statements for the sole purpose of derailing agreements and ancillary contractual negotiations between WMP and CSI.  (Am. Comp. ¶ 44; Exhibit A ¶ 32).

13.     As a direct result of Defendants' actions and conduct described herein, WMP terminated and canceled the contract by and between CSI and WMP for the seven (7) advanced thermal processing systems, resulting in a loss of contract by CSI with WMP which was quoted at a price of $47,000,000.00 USD.  Further, as a result of Defendants' actions and conduct described herein, WMP ceased any further contractual negotiations by and between the CSI and WMP for the three (3) ancillary advanced thermal processing systems, resulting in a loss of this business relationship with WMP, which was agreed to carry a contract price of $21,000,000.00 USD. (Am. Comp. ¶ 48-51; Exhibit A ¶ 36-37).

14.     The Defendants' actions were directly aimed at CSI, a Florida Corporation, and CSI has incurred an injury within the state of Florida, has been defamed, and has incurred immeasurable damages from the loss of prospective business from other third parties due to Defendants conduct and statements. (Exhibit A ¶ 38).

15.     CSI instituted this action on or about October 7, 2011, requesting relief for (1) Tortious Interference with Contractual Relations, (2) Tortious Interference with Business Relationship, (3) Defamation, and requesting (4) Injunctive and Declaratory Relief  [ECF No. 1].  CSI moved for and was granted Leave to Amend its initial Complaint [ECF No. 22] on December 19, 2011, and filed its Amended Complaint on December 22, 2011 [ECF No. 24].

16.     On or about January 3, 2012, the Defendants filed a Motion to Transfer Actions to the Southern District of New York for Consolidated Proceedings (hereinafter "Motion to Transfer") with the Judicial Panel on Multidistrict Litigation (hereinafter "Judicial Panel").

17.     Prior to the March 29, 2012 proceeding before the Judicial Panel, the Defendants instituted an action before the United States District Court for the Southern District of New York on March 22, 2012 (hereinafter "SDNY action"), against all Plaintiffs involved in the cases subject of Defendants' Motion to Transfer, along with others parties.

18.     On March 29, 2012, the parties to the instant action, as well as other parties in other actions, appeared in front of the Judicial Panel to submit their respective positions on transfer

pursuant to 28 U.S.C. § 1407.  On April 16, 2012, the Honorable Panel issued an Order Denying the Defendants' Motion to Transfer stating that the "proponents of centralization have failed to convince us that any factual questions shared by these actions are sufficiently complex or numerous to justify Section 1407 transfer at this time."  Subsequent to this Order and after a three and one-half month stay of the instant proceedings, this Honorable Court entered an Order setting aside the stay imposed and reopened the case for further proceedings. [ECF No. 30].

19.     The Defendants filed the instant Motion to Dismiss the Amended Complaint, attaching several documents thereto, on April 30, 2012 [ECF No. 36].  In the Motion to Dismiss, the Defendants appear to take a stance that HFP somehow has an "independent business interest in the subject of the challenged misconduct… through *HFP's client relationship with MMM*"

20.     The Defendants have filed the Declaration of Samuel J. Lieberman [ECF No. 37] (hereinafter "Declaration") and attached documents thereto which complicate this stance and the identification of the Defendants' relationship, if any, to Metals, Milling and Mining LLC ("MMM").  First, the Declaration states that Mr. Lieberman is "counsel for defendants *The NIR Group and Corey Ribotsky ("NIR")* in the above-captioned matter" and states that Mr. Lieberman makes "this declaration on personal knowledge in support of *NIR's Motion to Dismiss the Complaint*. (Declaration at ¶ 1). The Plaintiff is unaware of who NIR is and why a Declaration was filed on their behalf, and requests this Honorable Court to strike the Declaration.

21.     Second, the Declaration attaches a document entitled "Exhibit 6" [ECF No. 37-6], which is identified in the Declaration as a "true and correct copy of a November 19, 2009, engagement agreement between MMM and Defendant HFP Capital Markets LLC."  Upon review of "Exhibit 6," it appears that many of the statements made in Defendants' Motion to Dismiss are in direct contradiction with this "true and correct copy" of the MMM and HFP "engagement agreement."

22.     For instance, Paragraph 1 of this agreement provides that "[MMM] has engaged [HFP] and its affiliates… to act, as the exclusive agent to [MMM] for a period of *one hundred and eighty days (180)*, commencing on November 19, 2009" and that HFP will "use its reasonable best efforts to raise… two million dollars ($2,000,000) of the [MMM] debt securities." From this Paragraph, it appears that HFP's agreed-upon services, if any, would have ended on or about

May 18, 2010 – far in advance of any of the allegations concerning the Defendants' wrongdoing in the Amended Complaint.[1]

23.     In addition, Paragraph 2 of "Exhibit 6" provides the specific services HFP was sought by MMM to perform[2] – none of which include performing "due diligence" (be it first-round or second-round), or conducting any acts on behalf of MMM like filing lawsuits, travelling to locations, such as North Carolina, to "promote" any "business interest" of MMM, or converting monies received from any "qualified purchasers" into "HFP funds."   In fact, this Agreement provides quite the contrary, providing in Paragraph 5 that HFP "has been retained to provide *only* the services set forth in this Agreement" and that "HFP does not owe [MMM], or any other party, any fiduciary or equitable duty as a result of or in connection with this Agreement," and indicates that "HFP shall act as an independent contractor" under this agreement.

## MEMORANDUM OF LAW IN OPPOSITION

### I.     Personal Jurisdiction over the Defendants

In a diversity action, a federal court can exercise personal jurisdiction over a non-resident Defendant as permitted by the long-arm statute of the forum state.[3]   Courts strictly interpret the Florida long-arm statute, Fla. Stat. § 48.193; therefore, the party invoking jurisdiction has the burden of proving that personal jurisdiction exists.[4]   A Plaintiff merely needs to present enough evidence to withstand a motion for a directed verdict to make a prima facie showing that personal jurisdiction exists.[5]   If the Plaintiff does so, the burden then shifts to the Defendant to challenge the Plaintiff's allegations by declarations or other pleadings.[6]   If Defendant does so successfully, the Plaintiff must affirmatively support its jurisdictional allegations with evidence and may not merely rely upon the factual allegations set forth in the Complaint.[7]

---

[1] *See* Exhibit 6, Paragraph 10, provides that "[u]nless terminated earlier in accordance with its terms, this Agreement shall expire on the earlier of (i) the completion of the Proposed Financing or (ii) one hundred and eighty (180) days from November 19, 2009."

[2] Paragraph 2 of this "engagement agreement" provides that "[HFP] services to [MMM] will include (i) assisting [MMM] in its preparation of the Offering Materials described below; (ii) assisting [MMM] in structuring the Proposed Financing; (iii) identifying and contacting qualified purchasers… of the Proposed Financing and furnishing them, on behalf of [MMM], with copies of the Offering Materials; and (iv) negotiating, under the Company's guidance and instruction, the final terms and financial aspects of the Proposed Financing."

[3] *eLandia Int'l, Inc. v. Ah Koy*, 690 F. Supp. 2d 1317, 1327 (S.D. Fla. 2009) (quoting Rexam Airspray, Inc. v. Arminak, 471 F. Supp. 2d 1292, 1297-98 (S.D. Fla. 2007))

[4] *Id.*

[5] *See id.*; *see, e.g., Polskie Linie Oceaniczne v. Seasafe Transport A/S*, 795 F.2d 968, 972 (11th Cir. 1986).

[6] *See Rexam Airspray, Inc.*, 471 F.Supp.2d at 1298

[7] *See id.* (citing *Future Tech Int'l, Inc. v. Tae II Media, Ltd.*, 944 F.Supp. 1538, 1555 (S.D. Fla. 1996).

The Plaintiff respectfully submits that the Defendants have not challenged the Plaintiff's allegations by declarations or other pleadings. Attached to the Defendants' Motion to Dismiss are (1) Affidavit of Geoffrey Byruch [ECF No. 36-1], and (2) Declaration of Samuel J. Lieberman [ECF No. 37].[8]   The Affidavit of Geoffrey Byruch does not dispute or otherwise challenge any of the factual allegations in the Complaint. Rather, it merely states his name, that he is a Defendant, that a majority of employees of HFP reside in New York or New Jersey, Mr. Joseph Spano told him [Mr. Spano] lives in New Jersey, HFP's sole office is in New York, and that litigating this matter in Florida will cause him and HFP significant fees and costs as opposed to litigating in New York. Likewise, the Declaration of Samuel J. Lieberman fails to dispute or otherwise challenge the Amended Complaint's allegations. As stated above, this Declaration is not on behalf of either of the Defendants herein and is not based, on its face, upon personal knowledge of either Defendant. Further, even if it was on behalf of one or both of the Defendants, none of the attachments thereto reference the Plaintiff, Canadian Steel, Inc.,[9] and nothing in any of these attachments appear to refute or challenge any of the allegations in the Plaintiff's Complaint. Given this, the Affidavit and Declaration have failed to satisfy the burden to challenge the Plaintiff's allegations by declarations or other pleadings as annunciated in *Rexam Airspray* and, as such, Defendants have failed to meet their burden.[10]

In the Amended Complaint, Plaintiff has plead both general jurisdiction, pursuant to Fla. Stat. § 48.193(2), and specific jurisdiction, pursuant to Fla. Stat. § 48.193(1)(a) and Fla. Stat. § 48.193(1)(b), as a basis for personal jurisdiction over the Defendants.

### a.  Fla. Stat. § 48.193(2)

Plaintiff's Verified Amended Complaint indicates several instances to which the Defendants were engaged in "continuous and systematic general business contact" with Florida.

Fla. Stat. § 48.193(2) provides that:

> A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.[11]

---

[8] Two Affidavits of BYRUCH were previously filed in this case with the Defendants' Motion to Dismiss the original Complaint, but neither are attached to Defendants Motion to Dismiss, and the previous Motion to Dismiss became a nullity upon this Honorable Court's Order Denying Defendants' Motion to Dismiss as Moot [ECF No. 25] *See generally Koger v. Circuit County Court ex rel. Broward County Florida*, 2007 WL 2460736 (S.D.Fla. 2007).
[9] Exhibit 3 and Exhibit 4 reference "Canadian Steel Fabricators, Ltd." and not Plaintiff Canadian Steel, Inc.
[10] *See generally Rexam Airspray, Inc.*, 471 F.Supp.2d at 1298
[11] Section 48.193(2), Florida Statutes (2011).

Florida courts have found "substantial and not isolated activity" to mean "continuous and systematic general business contact" with Florida.[12]   The "continuous and systematic" contacts requirement is sufficient to fulfill the constitutional due process requirements of minimum contacts.[13]   Therefore, if the Defendants' activities meet the requirements of Fla. Stat. §48.193(2), the minimum contacts prong of the jurisdictional analysis is also satisfied and this Court may exercise personal jurisdiction over the Defendants.[14]   In their Motion to Dismiss, the Defendants seemingly dismiss the notion that general jurisdiction may be conferred due to their business activities within this state, and seem to ignore the several instances listed in the Amended Complaint which provide for general jurisdiction.  These instances listed in Paragraph 2 of the Amended Complaint are supported by either the Plaintiff's Affidavit or are statements made by the Defendants in various Motions and other papers filed with the Court, or are part of a publicly available information medium.[15]

For instance, both Defendants conduct business with individuals and entities in Florida on a systematic and continuous basis, and both are registered to do business in Florida.  HFP is registered to do business in Florida, and a portion of HFP's total business is with persons or entities in Florida.  (Exhibit A ¶ 7).  Indeed, HFP has been registered in Florida since January 12, 2000, and, in fact, Florida was the third state with which HFP registered. (*See* Exhibit B & Exhibit C).  HFP has not refuted the assertion that they have conducted business with Florida-based individuals and entities on a "systematic and continuous" basis from 2000 to the present. In addition, BYRUCH has been licensed with the state of Florida since February 26, 2009, which happens to be the longest he has been licensed in any state.[16]   (*See* Exhibit D).  Further, BYRUCH worked for Capital Growth Financial, LLC from May 2006 to February 2008, and Dawson James Securities, Inc. from February 2008 to February 2009. (*See* Exhibit D).  Capital Growth Financial, LLC was a financial services entity that is currently listed as inactive on the Florida Division of Corporations website, but reflects a principal address and mailing address on Federal Highway in Boca Raton, Florida. (*See* Exhibit E).  Dawson James Securities, Inc. is

---

[12] *Autonation, Inc. v. Whitlock*, 276 F.Supp.2d 1258, 1262 (S.D.Fla. 2003).
[13] *Id*.
[14] *See id*.
[15] *See* Exhibit A "Affidavit of George Mesa, Sr." ("Mesa Affidavit"); Exhibit B "FINRA BrokerCheck Report for HFP"; Exhibit C  "Florida Office of Financial Regulation - HFP"; Exhibit D "FINRA BrokerCheck Report for BYRUCH"; Exhibit E "Capital Growth Financial LLC SunBiz"; Exhibit F "Dawson James Securities, Inc. SunBiz"; Exhibit G "PAT Comp. Agreement 1"; Exhibit H "PAT Comp. Agreement 2"
[16] According to the FINRA Report, BYRUCH was also approved on February 26, 2009 in Connecticut and N.Y.

financial services entity with a principal address and mailing address on Federal Highway in Boca Raton, Florida. (*See* Exhibit F).  During his employ with these entities, BYRUCH lived in Florida for a period of time, and, while BYRUCH has filed three Affidavits in this case, there is no mention of these connections to Florida.  In fact, BYRUCH states in a November Affidavit that he has not had any "material business connection with the State of Florida" since January 1, 2008.

HFP also receives a pecuniary benefit from the business it conducts with Florida-based individuals and entities, and a portion of its overall revenue is from "Florida-based clients/business partners." (*See* Exhibit A).  While HFP claims to do "less than 5% (five percent) of its total business with persons or entities in Florida" and that "HFP gets less than 5% (five percent) of its overall revenue from Florida-based clients/business partners," nothing has been provided by the Defendants to support this assertion.  Further, as it is known that BYRUCH does indeed have contacts in the state of Florida, with other entities in the financial industry nonetheless, the total business and overall revenue Defendants derive from Florida may be much greater than BYRUCH leads us to believe.

HFP, through its employees, officers, directors, agents, or other personnel, have also traveled to Florida for business purposes on numerous occasions. CSI's President met personally with HFP in Florida to discuss various potential business opportunities on at least two separate occasions (*See* Exhibit A ¶ 16).  Additionally, in another pending Southern District of Florida action, Case No. 1:11-cv-24232-RNS, HFP is alleged to have entered into two Non-Circumvent/Non-Disclosure Agreements in the state of Florida in 2010, both of which contain a forum selection clause which both parties agreed to submit to jurisdiction in the Southern District of Florida.  (*See* Exhibit G & Exhibit H). Further, HFP and BYRUCH have alleged in the SDNY action that HFP transferred approximately $1.8 million to a Florida corporation, Plasma Arc Technologies, Inc., at various times between December 21, 2009 and November 29, 2010.

The facts in our case are quite synonymous to those in *Autonation, Inc. v. Whitlock*, where a prior six month connection with Florida, coupled with attending meetings and maintaining ongoing business contacts in Florida was sufficient for the Court to exercise personal jurisdiction.[17]  As was the case in *Whitlock*, even though HFP and BYRUCH may have been located physically outside of Florida, both were licensed in Florida, had clients and/or other

---

[17] *See Autonation, Inc.*, 276 F.Supp.2d at 1263

business associates in Florida, received a pecuniary benefit from the business conducted in Florida, derived a portion of overall revenue from Florida, and, in the case of BYRUCH, has lived or resided in Florida and worked for two entities which, at the time of his employ, had their principal office and mailing address in Florida, and, in the case of HFP, operated a website accessible in Florida, representatives travelled to Florida for business meetings on several occasions, and entered into two Agreements in Florida with a Florida corporation which contained a forum selection clause indicating that the parties will submit to jurisdiction in the U.S. District Court for the Southern District of Florida.[18]

Likewise, the facts of our case differ greatly from *Rexam Airspray*, which held that the Court did not have general jurisdiction over the Defendant pursuant to Fla. Stat. §48.193(2). In our case, both Defendants are licensed in the state of Florida, conduct business and obtain a portion of their overall revenue from Florida, HFP, through various representatives, have attended meetings in Florida and entered into agreements in Florida with a forum selection clause providing jurisdiction in the Southern District of Florida, BYRUCH has been employed by Florida entities, has lived or resided in Florida, and conducted business in Florida. In contrast, the Defendant in *Rexam Airspray* was a lifelong California resident that was hired by the predecessor of the Plaintiff as an independent sales representative.[19] The Plaintiff was a California corporation with its principle and sole place of business in California and had very little business activity in Florida.[20] Further, the "substantial business activity" in Florida was alleged to be through an agent of the Plaintiff, which the Court ultimately determined was not an affiliate or subsidiary, but a "customer" of the Plaintiff having a separate corporate existence.[21] For these reasons, as both Defendants have initiated and maintained continuous and systematic business contact in the state of Florida for over a decade[22] for pecuniary gain,[23] the Plaintiff respectfully submits that this Honorable Court has jurisdiction pursuant to Fla. Stat. § 48.193(2).

---

[18] *See Achievers Unlimited, Inc. v. Nutri Herb, Inc.*, 710 So.2d 716 (Fla. 4th DCA 1998) (Defendant's three year involvement with the Plaintiff, as well as subsequent involvement with another Florida-based company, establishes that Defendant had "continuous and systematic general business contacts").

[19] *See Rexam Airspray, Inc.*, 471 F.Supp.2d at 1294, 1296.

[20] *See id.*

[21] *See id.*

[22] HFP has been licensed in the state of Florida since 2000 and BYRUCH has an employment history with Avalon Research Group, Inc. in Boca Raton, FL from May 2009 to February 2000, and with HD Brous & Co., Inc. which had an 'employer location' in Boca Raton, FL from April 2000 to March 2005. (*See* Exhibit D BYRUCH FINRA)

[23] *See American Financial Trading Corp. v. Bauer*, 828 So.2d 1071 (Fla.App. 4 Dist. 2002).

### b.  Fla. Stat. § 48.193(1)(a)

Assuming, *arguendo*, that this Honorable Court does not find that it has general jurisdiction over the Defendants under Fla. Stat. 48.193(2), Plaintiff has also pled that personal jurisdiction is proper pursuant to § 48.193(1)(a), Florida Statutes (2001). (Am Comp. ¶ 3).

Defendants cite *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*,[24] which provides for certain factors to be considered in determining whether an entity is "operating, conducting, engaging in, or carrying on a business venture" pursuant to Fla. Stat. § 48.193(1)(a). In *Horizon*, the Court stated that the factors relevant, but not dispositive, to this inquiry include (1) the presence and operation of an office in Florida, (2) the possession and maintenance of a license to do business in Florida, (3) the number of Florida clients served, and (4) the percentage of overall revenue gleaned from Florida clients.[25]

As stated above, both Defendants serve Florida clients, are licensed to do business in Florida, and derive a portion of their overall revenue from Florida.  While the Defendants claim that neither has an office in the state of Florida, the Court in *Horizon* states that while the factors are relevant, they are not dispositive, and not all need to be present in order to determine whether a Defendant is carrying on a business for purposes of the long-arm statute.[26]  This position was acknowledged in *Gulf Power Co. v. Coalsales II, LLC*, which is listed as one of the "negative citing references" to *Horizon*.[27]  In *Gulf Power*, the Court distinguished its facts from that of *Horizon*, finding that, while the Defendant Coalsales II, LLC did not maintain an office in Florida, served only three Florida clients, and obtained only a relatively small percentage of its overall revenue from those clients, other factors weighed in favor of finding personal jurisdiction, including the fact that Coalsales personnel traveled to Florida on numerous occasions for business purposes.[28]  In the present case, while Defendants do not maintain an office in Florida, other factors weigh heavily in favor of the position that Defendants are "operating, conducting, engaging in, or carrying on a business venture" in the state of Florida: both HFP and BYRUCH are registered to do business in Florida, HFP representatives traveled to Florida for business purposes on numerous occasions, BYRUCH worked with two Florida-based entities that conduct many of the same business functions as HFP, HFP operates a website that is

---

[24] *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162 (11th Cir. 2005).
[25] *Id.* at 1167.
[26] *See id.*
[27] *Gulf Power Co. v. Coalsales II, LLC*, No. 3:06cv270/MCR, 2008 WL 563484 (N.D.Fla. Feb. 27, 2008).
[28] *See id*, at *5, fn. 15.

freely accessible to individuals and entities within Florida, and Defendants serve Florida-based clients to which a portion of overall revenue is attributed.

### c.  Fla. Stat. § 48.193(1)(b)

Personal jurisdiction over the Defendants is also proper pursuant to §48.193(1)(b), Florida Statutes (2001).  Both the United State District Courts for the Southern District and Middle District of Florida in recent opinions have found personal jurisdiction proper over out of state Defendants committing tortious acts out of state that cause injury in Florida.[29]

In *eLandia, International, Inc. v. Ah Koy*, the Court discussed Fla. Stat. § 48.193(1)(b) and its interpretation as it pertains to tortious acts occurring outside the state of Florida[30]:

> The Eleventh Circuit has consistently applied the broader construction of subsection 1(b) and **found personal jurisdiction over someone who commits a tortious act outside the state that results in harm inside the state**. Id. at 1216 (citing Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 257 (11th Cir. 1996); Sun Bank, N.A. v. E.F. Hutton & Co., 926 F.2d 1030, 1033-34 (11th Cir. 1991)). We are bound to follow the Eleventh Circuit's well established line of cases that apply the broader construction of subsection 1(b) because the Florida Supreme Court has not issued a decision rejecting the Eleventh Circuit's interpretation. See Posner, 178 F.3d at 1217. Therefore, under the Eleventh Circuit's construction of the elements required for jurisdiction under section 48.193(1)(b), **this statute permits jurisdiction over a non-resident defendant who commits a tort outside of the state that causes injury inside the state.** See also Licciardello v. Lovelady, 544 F.3d 1280, 1283 (11th Cir. 2008) (citing Posner, 178 F.3d at 1216).[31]

By the Defendants asserting that a communication must be made "into Florida," the Defendants appear to promote a narrow reading of Fla. Stat. § 48.193(1)(b), even though case law dictates that a broader construction under subsection (1)(b) should be applied.[32]

In their Motion to Dismiss, Defendants acknowledge in a footnote that they are aware of three cases that were previously presented by the Plaintiff in support of jurisdiction under Fla. Stat. § 48.193(1)(b) (*Licciardello v. Lovelady*, *Lehigh Techs., Inc. v. Farrah*, and *eLandia*), but

---

[29] *See eLandia*, 690 F.Supp.2d 1317 (S.D.Fla. 2010); *Enviracarbon, Inc. v. Couch*, No. 6:10–cv–1886–Orl–35DAB, 2011 WL 4501058, at *2 (M.D.Fla. June 20, 2011); *Seminole Transportation Specialists, Inc. v. PDM Bridge, LLC, et. al.*, No. 8:09-cv-1885-T-23MAP, 2009 WL 3822773 (M.D.Fla. Nov. 16, 2009) ("[Fla. Stat. 48.193] is interpreted as permitting the exercise of personal jurisdiction if the 'foreign tortious act cause[d] injury within the forum' even though the tortious act occurred outside Florida.")).
[30] *eLandia*,  690 F.Supp.2d at 1329.
[31] *Id*. (Emphasis added).
[32] *See id*.

urge the Court to believe that each of the decisions are distinguishable from the instant action because "communications and/or relationships into Florida were a fundamental consideration." The Plaintiff is not entirely sure what the Defendants mean by this footnote statement, but submit to this Honorable Court that the respective torts in each of those cases concerned (1) *Licciardello* – trademark infringement on a website created in Tennessee caused injury in Florida,[33] (2) *Lehigh* – Lehigh's tortious interference claim that "Farrah (Michigan company) engaged in tortious interference with Lehigh's business relations by sending defamatory and threatening letters to third parties in other states (such as Michigan, Texas, and South Carolina)",[34] and (3) *eLandia* – Defendant Michael Ah Koy telling representative of Steamships (third party which Plaintiff had negotiated an offer to sell its 50% interest in Datec PNG) in Papua, New Guinea that he planned on blocking eLandia's transaction with Steamships, resulting in Steamships refusing to close the transaction[35] The situations in each of these cases, even after a "close look" are quite analogous to the events in our case.

Further, the damages sustained by the Plaintiff herein are similar to the damages sustained in *eLandia*. In *eLandia*, the Court stated:

> **If an individual tortiously interferes with a business relationship outside of Florida that causes injury in Florida, the individual is subject to personal jurisdiction under the Florida long-arm statute.** See Lehigh Tech., Inc. v. Farrah, 2:08-cv-53-FtM-29SPC, 2009 U.S. Dist. LEXIS 4838, 2009 WL 179672, at 5 (M.D. Fla. Jan. 23, 2009).

> Plaintiff eLandia alleges that Steamships **refused to purchase eLandia's shares in Datec PNG because Defendants intentionally and maliciously interfered with this business relationship.** [D.E. 4 at 31]. **eLandia also contends that it has suffered monetary damages because of Defendants' tortious conduct.** Id. **These allegations are sufficient to show on a prima facie basis that Defendants all committed a tort that caused eLandia, a company with a principal place of business in Florida, to suffer harm in the state of Florida.** See Lehigh Tech., 2009 U.S. Dist. LEXIS 4838, 2009 WL 179672, at 5 (concluding plaintiff adequately alleged a claim of tortious interference by stating defendant sent defamatory and threatening letters to third parties in other states).[36]

---

[33] *See Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008).
[34] See *Lehigh Techs., Inc. v. Farrah*, 2009 WL 179672, at *5 (M.D.Fla. Jan. 23, 2009)
[35] See *eLandia*, 690 F.Supp.2d at 1326.
[36] *Id*. at 1331-1332. (Emphasis added).

In addition, our case is similar to *Enviracarbon, Inc. v. Couch*, where two similar counts were present: (1) Tortious Interference with Business Relationship and (2) Defamation.   In *Enviracarbon*, the Plaintiff, a Florida corporation, alleged that the Tennessee Defendants made a series of misrepresentations in an effort to solicit one of Plaintiff's potential investors in an attempt to directly compete with Plaintiff and usurp Plaintiff's business opportunity.[37]   The Defendants in *Enviracarbon* filed a Motion to Dismiss, devoting a substantial portion of the Motion to the argument that "no tortious conduct occurred in Florida," just as the Defendants herein do in stating that no communications were made "into Florida." The Court in *Enviracarbon* followed the Eleventh Circuit's broad construction of Fla. Stat. 48.193(1)(b), finding that physical presence of a Defendant in Florida is not required, provided the tort causes injury into Florida.   Further, the *Enviracarbon* Court noted that the "Eleventh Circuit has additionally recognized that intentional torts, including tortious interference, have been more likely to satisfy the requirements of Fla. Stat. 48.193(1)(b) than torts involving negligence."[38] Furthermore, the *Enviracarbon* court found that even though no allegation that the defamatory statements were published in Florida, the Court may exercise jurisdiction over the defamation claim because it arose from the same jurisdiction generating event as the related tort claims alleged.[39]   For these reasons, the Plaintiff respectfully requests that this Honorable Court find that personal jurisdiction exists over the Defendants pursuant to Fla. Stat. § 48.193(1)(b).

## II.      Jurisdiction Over the Defendants Comports with the Due Process Clause

Respectfully, if the Defendants' business activities and contacts are "continuous and systematic" Fla. Stat. § 48.193(2), the Plaintiff respectfully requests this Court to conclude that the minimum contacts requirement is also satisfied.[40]   Alternatively, should this Honorable Court determine the statutory requirements of either Fla. Stat. §48.193(1)(a) or Florida Stat. §48.193(1)(b) have been met, the Plaintiff respectfully requests that this Honorable Court find the requirements of the Due Process Clause be satisfied.

---

[37] *See Enviracarbon, Inc.*, 2011 WL 4501058, at *1.

[38] *Enviracarbon, Inc.*, 2011 WL 4501058, at *3 (citing Posner v. Essex Ins. Co. 178 F.3d 1209 (11th Cir. 1999)).

[39] *See id.*; *see Brennan v. Roman Catholic Diocese of Syracuse N.Y., Inc.*, 322 F.App'x 852, 854 (11th Cir. 2009) (holding that if the forum's long-arm statute provides jurisdiction over one claim, the district court has personal jurisdiction over the entire case so long as the claims arose from the same jurisdiction generating event).

[40] *See Autonation, Inc.*, 276 F.Supp.2d at 1262 (finding that if the Defendant's activities meet the requirements of section 48.193(2), the minimum contacts prong of the jurisdictional analysis is also satisfied and the Court may exercise personal jurisdiction over the Defendant); *see also Achievers Unlimited, Inc.*, 710 So.2d 716.

Case No. 11-23650–CIV-ALTONAGA/SIMONTON

In the present case, the Defendants herein have committed intentional acts/torts against the Plaintiff that harmed the Plaintiff in the forum state (Florida).  As the Court explained in *eLandia*, this is enough to satisfy due process:

> The Due Process analysis requires a "substantial connection" with the forum. Even a single act can give rise to such a connection to support the exercise of personal jurisdiction. See, e.g., Burger King, 471 U.S. at 475. **It is thus well recognized that intentional torts are classic examples of such acts that give rise to jurisdiction over a non-resident defendant who has no other contacts with the forum state.** Licciardello, 544 F.3d at 1285. The Eleventh Circuit indeed held in Licciardello that **the commission of an intentional tort by a nonresident defendant expressly aimed at a resident, the effects of which were suffered by the resident in the forum state, satisfies the "effects test" established by the Supreme Court in Calder v. Jones, 465 U.S. 783, 789-90, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984). Id. at 1288. The "effects test" provides that due process is satisfied when the plaintiff brings suit in the forum here (sic) the "effects" or the "brunt of the harm" caused by the defendant's intentional tortious activity was suffered.** *Id.* at 1285-87.
>
> **Consequently, the Due Process clause is not violated when a court exercises jurisdiction over a defendant's intentional tortious conduct, committed outside of the forum state but calculated to cause injury in the forum state, because the defendant must have reasonably anticipated being haled into court in the forum state regarding those actions**.[41]

The United States Supreme Court, in *Calder v. Jones*,[42] has explained that, unlike a person "charged with mere untargeted negligence," the perpetrator of an intentional tort can reasonably anticipate being haled into a forum where he knows his actions could have a "potentially devastating impact" upon the targeted party.[43] Thus, personal jurisdiction is proper under the "effects" test if the Plaintiff alleges that the Defendants (1) committed an intentional tort, (2) the intentional tort was aimed at the Plaintiff, and (3) the Plaintiff felt the effects of the intentional tort in the forum state.[44]

In our case, the Defendants (1) committed two intentional torts (tortious interference with contractual relations and tortious interference with business relationship), (2) these intentional torts were aimed at the Plaintiff, and (3) the effects of the intentional tort were felt by the

---

[41] *Id*. at 1338. Emphasis added.
[42] *Calder v. Jones*, 465 U.S. 783, 789-790 (1984).
[43] *Id.*
[44] *Enviracarbon, Inc.*, 2011 WL 4501058; *see also Licciardello*, 544 F.3d 1280; *Brennan*, 322 F.App'x at 854.

Plaintiff in the state of Florida.  Defendants knew that the Plaintiff was a Florida corporation and made statements specifically about the Plaintiff to a third party known to have a contractual and business relationship with the Plaintiff, which caused not only an unjustifiable damage to Plaintiff's reputation and professional standing, but, also, caused a third party to terminate its contractual and business relations with the Plaintiff, including (1) loss of a contract for $47 million and (2) loss of prospective contract anticipated for $21 million.  The Defendants have not disputed any of these facts, and have actually affirmed that the statements were made concerning the Plaintiff to the third party in question.

The exercise of personal jurisdiction over the Defendants also comports with "fair play and substantial justice" under the due process analysis.[45]

> With respect to the intentional tort claims, we must also evaluate whether exercising jurisdiction would comport with "fair play and substantial justice" under the due process analysis. We thus consider the burden on Defendants of litigating in Florida, Florida's interest in adjudicating the dispute, Plaintiff's interest in obtaining convenient and effective relief and the judicial system's interest in resolving the dispute. E.g., Licciardello, 544 F.3d at 1284.  **We readily find that the Florida based Plaintiff, injured by intentional misconduct of Defendants expressly aimed at Florida, should not have to travel half a world away to obtain a remedy**.  Additionally, **Florida has a very strong interest in affording its residents a forum to obtain relief from intentional misconduct by non-residents causing injury in Florida**.[46]

In their Motion to Dismiss and Affidavit, the Defendants state that they will suffer unnecessary, significant fees and costs regarding litigating this matter in Florida, and suggest that Plaintiff, a Florida corporation who suffered injury within Florida due to Defendants' misconduct should be required to seek remedy elsewhere for their claims.  This is not only a callous assertion, but is in direct contradiction to the 11th Circuit's *eLandia* decision cited above, as well as *Licciardello*, which stated that a "Florida plaintiff, injured by the intentional misconduct of a nonresident expressly aimed at the Florida plaintiff, is not required to travel to the nonresident's state of residence to obtain a remedy."[47]

---

[45] *See eLandia*, 690 F.Supp.2d at 1339.
[46] *id*. Emphasis added.
[47] *Licciardello*, 544 F.3d at 1288; *see also Enviracarbon, Inc.*, 2011 WL 4501058, at *5 (Florida "has a 'very strong interest' in affording its corporations 'a forum to obtain relief from intentional misconduct of nonresidents causing injury in Florida").

In conclusion, given the Defendants' intentional and injurious misconduct aimed at the Florida Plaintiff which caused injury to Plaintiff in Florida, the Defendants should be compelled to appear in a Florida Court.  The Defendants have sought and obtained business in Florida on a systematic and continuous basis, and have reaped pecuniary benefit from Florida.  Given the foregoing, "fair play and substantial justice" is not compromised by having these Defendants answer in Florida to their actions aimed at a Florida corporation resulting in injury in Florida.

### III.    Transfer to the Southern District of New York is Not Proper

The Defendants alternatively move to transfer this cause to the United States District Court for the Southern District of New York.  In so doing, the Defendants appear to have taken the liberty of relieving the District Courts of the power to determine where proper jurisdiction exists over the parties.  The Defendants boldly assert that the Southern District of New York shall be the proper Court to hear the present action because a subsequently-filed action commenced by the Defendants on March 22, 2012 "addresses similar issues, yet does not involve similar personal jurisdiction problems."  Amazingly, Defendants have come to this conclusion even though the time permitted for responsive pleadings has not yet elapsed and no responsive pleadings have been filed to date in that action.

Respectfully, in determining whether transfer is proper pursuant to 28 U.S.C. §§ 1404(a), the Court has considered the following factors: (1) whether the proposed transferee court is one which the action "might have been brought" and (2) whether the transfer is warranted "for the convenience of the parties and witnesses, [and] in the interests of justice."[48]  As for the first prong, an action "might have been brought" in a proposed transferee court if that court has jurisdiction over the subject matter of the action, if venue is proper there, and if the Defendant is amenable to process issuing out of the transferee court.[49]  In the present case, it is unlikely venue would be proper in the Southern District of New York as Defendants propose.  In order for venue to be proper in diversity actions, an action is to be brought either (1) in a judicial district where any Defendant resides, if all Defendants reside in the same state, (2) where a substantial part of the events or omissions giving rise to the claim arose, or (3) where the Defendants are subject to personal jurisdiction, if there is no district in which the action may otherwise be brought.[50]

---

[48] *See Cordis Corp. v. Siemens-Pacesetter, Inc.*, 682 F.Supp. 1200 (S.D. Fla. 1987).
[49] *Miot v. Kechijian*, 830 F.Sup. 1460, 1465 (S.D. Fla. 1993).
[50] 28 U.S.C.A. § 1391(a).

First, the Southern District of New York is not a "judicial district where any Defendant resides, if all Defendants reside in the same state."   BYRUCH is a citizen of New Jersey, and HFP is a New York-based entity.   Thus, all Defendants do not reside in the same state.   Second, while some statements were made by BYRUCH in New York, and HFP is a New York-based entity, there are potential witnesses located in New Jersey (which is not New York, regardless if it is driving distance), California, North Carolina, and Florida, which is likely to be the home of the most witnesses, especially if this Honorable Court considers (as Defendants urge) the SDNY action, as the large majority of the "Defendants" in that cause reside in Florida.   Further, even considering only the present action, there are still more potential witnesses from the state of Florida than other locations.   Finally, it is unknown as to whether BYRUCH would personally be subject to jurisdiction in New York, as he resides in New Jersey.

The arguments of the Defendants' herein are strikingly similar (if not identical) to those alleged in its Briefs filed in the Judicial Panel proceedings.   As Defendants acknowledge in their Motion to Dismiss, the Honorable Panel rejected Defendants' request to consolidate and transfer proceedings to the Southern District of New York.   Indeed, it is interesting that Defendants assert that the instant cause of action "could have been brought in the New York Court" because that same question was asked of Defendants' counsel as it relates to Florida by one of the members of the Honorable Judicial Panel. (*See* Exhibit I).   Specifically, the Honorable Judge Rendell asked Defendants' counsel, in part, "You could have instituted your actions in Florida or somewhere where actions were already pending.   Why couldn't these be coordinated?" (Exhibit I, p. 6).   In addition, the Honorable Judge Rendell inquired of Defendants' counsel, as it pertained to the nature of the actions Defendants were seeking to consolidate and transfer, "[w]hat makes it so complex?" and, after Defendants' counsel attempted to answer the inquiry and Judge Rendell correctly identified that the Defendants "just brought" the related SDNY action and that the Defendants "instituted" the same, Judge Rendell specifically asked Defendants' counsel "[a]re you creating the complexity here, though?" (*See* Exhibit I)

The issue presented by the Honorable Judge Rendell on March 29, 2012 is the same issue we are dealing with now in this section of the Motion to Dismiss.   The Defendants are ultimately seeking to transfer this case to the Southern District of New York for the benefit of two participants in this case.   The two: (1) HFP, a New York entity, and (2) Defendants' New York counsel.   No other party is a citizen of or is an entity based in New York.

In addition to its position above, the Plaintiff submits to this Honorable Court that, if any transfer is warranted pursuant to 28 U.S.C. § 1404, transfer of the SDNY action to the Southern District of Florida is proper pursuant to the "first-filed rule," which provides that, "where two actions involving overlapping issues and parties are pending in two federal courts, there is a strong presumption" that all claims should be heard in the forum of the first-filed suit.[51]  It is clear that the Plaintiff's Complaint filed in the instant cause October 7, 2011, came well before the Defendants' SDNY action filed on March 22, 2012.  As such, Plaintiff respectfully requests this Honorable Court deny Defendants' alternative request to transfer this action to the Southern District of New York.  Further, the Plaintiff respectfully requests that, if this Honorable Court is inclined to transfer pursuant to 28 U.S.C. § 1404, that this Honorable Court retain jurisdiction in the Southern District of Florida pursuant to the "first-filed rule."

## IV.    The Plaintiff's Tortious Interference Claims Should Not Be Dismissed

Defendants also allege that the Plaintiff's tortious interference claims should fail as a matter of law "[b]ecause the Complaint alleges that Defendants' motivation was to advance a business interest with their clients…." The Defendants rely heavily on *Barco Holdings, LLC v. Terminal Inv. Corp.*, where the Court affirmed an entry of summary judgment finding that a Defendants' right to exercise a purchase option cannot constitute tortious interference.[52]  While Plaintiff is in stark disagreement with Defendants concerning the relationship between themselves and the Defendants in *Barco*, the issue of whether Defendants had any "business interest" that imputed unto them any sort of "privilege to interfere" is not an issue that is considered upon a Motion to Dismiss;[53] but, rather, must be pled as an affirmative defense.[54]

The Defendants acknowledge the above-stated premise in the first part of footnote 32, whereby Defendants state "a business interest is a defense to a tortious interference claim…."  In addition, "Exhibit 6" attached to the Declaration of Samuel J. Lieberman has cast serious issue as to whether HFP had any "client relationship" as Defendants refer to in their Motion to Dismiss

---

[51] *Nebula Glass International, Inc. v. Budnick Converting, Inc.*, 2010 WL 473330, at *1 (S.D.Fla. 2010) (citing Manuel v. Convergys Corp., 430 F.3d 1132 (11th Cir. 2005).
[52] *See Barco Holdings, LLC v. Terminal Inv. Corp.*, 967 So. 2d 281 (Fla.App. 3 Dist. 2007).
[53] *See Southeastern Integrated Medical, P.L. v. North Florida Women's Physicians, P.A.*, 50 So.3d 21, 24 (Fla. 1st DCA 2010) (holding that it is improper for the trial court to consider the Defendants' motives on a Motion to Dismiss); *see also Londono v. Turkey Creek, Inc.*, 609 So.2d 14, 19 n. 4 (Fla. 1992) (the consideration of defenses is premature on a motion to dismiss)
[54] *See Melbourne Medical Lab. v. Lab Corp.*, 722 So.2d 962, 964 (Fla. 5th DCA 1998) (finding that competition or economic privilege is an affirmative defense to a tortious interference claim and, as such, must be pled).

with any entity.   Further, the *Barco* case relied upon so heavily by the Defendants was considered upon a Motion for Summary Judgment, not a Motion to Dismiss.   Furthermore, the issues the existence of a privilege are not always readily determinable on even a Motion for Summary Judgment and, where statements are in dispute, the question of privilege is a factual determination for resolution by the jury.[55]   The mere existence of a conceivably sustainable affirmative defense… does not mandate the dismissal of a claim; rather, the claim should be permitted to advance to the next stage of litigation where the claim and the affirmative defenses may be fleshed out."[56]   Respectfully, the Plaintiff has sufficiently pled a claim for both tortious interference with contractual relations and tortious interference with business relations against the Defendants, and any claims of "business interest" the Defendants allegedly possess that grant any form of "privilege" to commit the actions against the Plaintiff should be stated as an affirmative defense and not considered upon a Motion to Dismiss.

## V.   The Plaintiff's Defamation Claims Should Not Be Dismissed

In the Motion to Dismiss, the Defendants claim that the "Complaint also pleads the defamation claim out of Court."   The Defendants do not assert that the Complaint fails to state a cause of action; rather, the Defendants request that this Court make a final determination under *Nodar*, as to whether (1) the Defendants had a "qualified privilege" and (2) the Defendants' statements were made with malice.[57]   As in *Nodar*, these are factual issues to be determined through evidence presented to the jury.   Further, as discussed in *Glynn v. City of Kissimmee* provides, a "qualified privilege" is a defense with the burden of proving it resting with the Defendants, and whether the privilege exists or has been exceeded in some manner creates a mixed question of law and fact which should be determined by the trier of fact.[58]

Likewise, the Defendants' assertion that the "Complaint fails to allege facts showing express malice" appears misguided.   As stated in *Nodar*, "express malice" is present where the primary motive for the statement is shown to have been an intention to injure the Plaintiff.[59]   The Plaintiff has indeed pled that Defendants made the statements concerning Plaintiff knowing that "injury or damage would result" and that Defendants' "false and malicious statements were

---

[55] *See McCurdy v. Collis*, 508 So.2d 380, 382 (Fla. 1st DCA 1987).
[56] *See Stewart Title Guaranty Company v. Title Dynamics, Inc.*, 2005 WL 2548419, at *5 (M.D.Fla. 2005).
[57] *See Nodar v. Galbreath*, 462 So.2d 803 (Fla. 1984).
[58] *Glynn v. City of Kissimmee*, 383 So.2d 774, 775 (Fla. 5th DCA 1980).
[59] *See Nodar*, 462 So.2d at 806.

intended to cause monetary loss." (Am. Comp. ¶71, 73).   As such, the Plaintiffs respectfully request this Honorable Court to deny the Defendants Motion to Dismiss in this regard.

### VI.   Count IV Should Not be Dismissed

The Defendants also request this Court dismiss Count IV of the Complaint, asserting that Plaintiff has failed to allege irreparable harm necessary to sustain a claim for injunctive relief.

Pursuant to Fed. R. Civ. P. 12(b)(6), a Court must determine whether a Plaintiff sets forth sufficient factual allegations to establish a claim upon which relief may be granted.   In evaluating whether Plaintiffs have stated a claim, the Court must determine whether the pleading satisfies Fed. R. Civ. P. 8(a)(2).   To satisfy the pleading standard of Fed. R. Civ. P. 8(a)(2), a Complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face.[60] Further, in ruling on a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), the Court must construe the Complaint in the light most favorable to the Plaintiff and accept all well-pled factual allegations as true.[61]

Plaintiff herein is seeking an injunction enjoining Defendants from engaging in further acts that Defendants may engage which interfere with its existing business.   Plaintiff has pled this in Paragraph 75 of its Amended Complaint and has referenced the same in a footnote thereto, which states:

> "Although a portion of this cause of action is for damages, CSI has other contracts with this client and capital funding partner, and additionally has several contracts throughout the world.   This is why injunctive relief is also appropriate as CSI's business can be irreparably harmed in perpetuity if the interference with its funders and physicists continues."

Am. Complaint, ¶ 75, fn. 1.

This claim is hardly "speculative" as the Defendants classify it, as this is a very real concern of the Plaintiff and one which the conduct of the Defendants has a sufficient probability of occurring again.   As the Plaintiff has stated a claim upon which injunctive relief may be granted, the Motion to Dismiss to that effect should be denied.   Likewise, declaratory relief is also proper, as there is basis to avoid the accrual of avoidable damages which may arise in the future should the Defendants continue on the pattern of conduct described herein.   As such, Defendants' Motion to Dismiss to that effect should also be denied.

---

[60] *Ashcroft v. Igbal*, 556 U.S. 662 (2009).
[61] *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009).

**WHEREFORE**, Plaintiff respectfully requests that this Court deny the Defendants' Motion to Dismiss, with prejudice, in all respects, or, alternatively, allow for jurisdictional discovery and a hearing on the matter, and award any such and further relief that this Court deems just and proper.

Dated: May 17, 2012                                    Respectfully Submitted,

                                                            <u>  s/ John C. Webb, Esq.            </u>
John C. Webb, Esq. (Fla. Bar No. 48601)
johnwebblegal@gmail.com
P.O. Box 60832
Fort Myers, FL 33906
Telephone: 941-404-5313
Fax: 1-888-465-7258
Attorney for Plaintiff Canadian Steel, Inc.

Case No. 11-23650–CIV-ALTONAGA/SIMONTON

## Certificate of Service

**I hereby certify** that a true and correct copy of the foregoing was served via transmission

of Notices of Electronic Filing generated by CM/ECF on May 17, 2012, on all counsel or parties

of record on the Service List below.


s/ John C. Webb, Esq._____

Attorney Name


## SERVICE LIST

Solomon B. Genet, Esq.
Florida Bar No. 617911
sgenet@melandrussin.com
MELAND RUSSIN & BUDWICK, P.A.
3000 Southeast Financial Center
200 South Biscayne Boulevard
Miami, FL 33131
Telephone: (305) 358-6363
Telecopy: (305) 358-1221
Attorney for Defendants HFP Capital Markets, LLC and Geoffrey Byruch


Samuel J. Lieberman, Esq.
Sadis & Goldberg LP
551 Fifth Avenue, 21st Floor
New York, NY 10128
Telephone: (212) 573-8164
Fax: (212) 573-8149
Email: Slieberman@sglawyers.com
Attorney (*pro hac vice*) for Defendants HFP Capital Markets, LLC and Geoffrey Byruch